CADY v. RAINWATER.

Opinion delivered April 16, 1917.

1. RESCISSION OF CONTRACT OF SALE—FRAUD—NECESSARY ELEMENTS.—
Appellant was induced to purchase an apple orchard from appellees,
because of certain representations of the appellees and their agent.
Held, the transaction would be rescinded and set aside, and the
equities of the parties adjusted on the grounds that fraud was the
inducement of the contract, that the appellant sustained an injury
thereby, that the appellant contracted upon the faith of the appellees'
statements, and that appellant relied upon such misrepresentations,
had a right to rely upon them, and was herself in the exercise of ordi-
nary care and diligence.

2. PRINCIPAL AND AGENT—FRAUDULENT MISREPRESENTATIONS BY
AGENT.—A principal is responsible for the damages growing out of
the false and fraudulent misrepresentations of his agent, made within
the scope of his authority. In procuring the sale of an apple orchard,
false representations by the owner's selling agent made to the pur-
chaser, as to the number of trees in the orchard, its yearly income, and
similar matters, are within the scope of his authority.

Appeal from Conway Chancery Court; J. E. Mar-
tineau, on exchange, Chancellor; reversed.

McMillan & McMillan and Samuel Frauenthal, for
appellant, Catherine Cady.

1. The evidence clearly shows that through the false
and fraudulent representations of Vestal and Haygood,
appellant was induced to enter into the purchase of the
orchard and was thereby defrauded. She relied upon the
false misrepresentations, and they were material. The
sale should be set aside. 100 Ark. 144; 47 Id. 335; 55
Id. 296; 96 Id. 371; 97 Id. 265; 98 Id. 44; 99 Id. 438; 112
R. C. L., § 113; 37 L. R. A. 593, note. Where one relies
on misrepresentations which are material, it will avoid
a sale, even though investigation has been made. 12 R.
C. L. 357, § 111; Ib. 358, § 112; 15 L. R. A. (N. S.) 1092;
16 Id. 818; 34 Id. 1147; 11 L. R. A. 196; 12 R. C. L., §
127; 4 R. C. L. 516, § 27; 6 Cyc. 301; 47 Ark. 148.

2. Vestal and Haygood were agents of appellees,
and they are chargeable for the injury sustained by rea-
son of their false and fraudulent misrepresentations.

Wharton's Com. on Agency & Agents (1876), § § 164, 171, 172; 23 Ark. 289; 8 How. (U. S.) 134; 36 Ark. 532.

3. The agent is also liable. Wharton's Com. on Ag., etc., § 541; 31 Cyc. 1561; 140 N. Y. 227.

4. The court had jurisdiction. 99 Ark. 438. The decree setting aside the sale should be affirmed, but a personal judgment should be rendered for appellant as prayed.

*Callaway & Huie,* for appellant Vestal.

1. The court erred in granting a rescission of the contract and canceling the sale. There was no fraud nor false misrepresentations within the rule. 47 Ark. 148, 165; 11 *Id.* 58; 101 *Id.* 603; 19 *Id.* 522; 27 *Id.* 245; 71 *Id.* 91, 97; 2 Pom. Eq. Jur., § 893; 83 Ark. 403; 95 *Id.* 375, 131; 100 *Id.* 144; 1 Sm. & M. (Miss.) 443.

2. It is impossible to put parties *in statu quo.*

*Sellers & Sellers,* for appellees.

1. Fraud is never presumed, but must be proved by clear proof. 9 Ark. 482; 11 *Id.* 378; 63 *Id.* 22; 45 *Id.* 492; 37 *Id.* 145; 47 *Pac.* 1016; 52 *Id.* 726; 53 *Id.* 29.

2. One may not complain who either investigates for himself or has a fair opportunity to do so. 95 Ark. 377; 11 *Id.* 58; 19 *Id.* 522; 46 *Id.* 337; 47 *Id.* 148; 14 Am. & Eng. Enc. Law, 33; 87 Ark. 570; 26 *Id.* 31; 113 S. W. 1015; 82 Ark. 24; 31 *Id.* 173; 46 *Id.* 245; 104 *Id.* 396; 71 *Id.* 97, and others.

3. Vestal's letters were not acted upon or intended to be acted upon. 31 Ark. 173.

4. The *status quo* was not restored. 53 Ark. 16; 38 *Id.* 342; 31 *Id.* 364; 15 *Id.* 386; 96 *Id.* 251; Black on Rescission of Cont., § 634.

5. Appellant is barred by delay. 39 Cyc. 1382; 46 Ark. 348; 26 *Id.* 32; 24 Ind. 339.

6. No personal decree can be entered for fraudulent misrepresentations by Vestal. 19 Cyc. 186; 33 Ark. 436. The title conveyed by Mrs. Cady was not good. Mrs. Cady's claim is entirely without merit. 95 Ark. 131, etc.

HUMPHREYS, J. This suit was instituted on November 24, 1913, in the Conway Chancery Court by J. Wood Rainwater, Pearl Rainwater and Cloud N. Rainwater, against Catherine M. Cady and A. J. Vestal, to obtain a personal judgment against them for $10,000 and interest, and to foreclose a lien given to secure the amount of $10,000 on the following described real estate and personal property in Conway County, Arkansas, towit: The east half of section twenty-five (25), township six (6) north, range eighteen (18) west, containing 320 acres, more or less; and all the farming and orchard implements on the place and used in connection with the orchard, such as plows, sprayers, rakes, barrels, wagons and horses.

T. J. Cady was made a party defendant in the original bill because he was in possession of the fruit farm in Arkansas.

Catherine M. Cady filed a separate answer and cross-bill denying liability on the notes evidencing said indebtedness for the alleged reason that she was induced to sign the notes through the fraudulent representations of the plaintiffs and their agent, A. J. Vestal, in the following particulars, towit: That there were 16,000 fruit trees on the land eleven years old in full bearing and 4,000 fruit trees six years old just beginning to bear; that it was the finest orchard in the State of Arkansas; that the apples on said orchard netted the owner $15,000 in 1910; that the portion of land covered with trees was worth $200 per acre and the other land $125 per acre.

She further alleged that she relied upon the false representations so made in purchasing the property for which the notes sued on were given; that in addition to signing the notes as a part of the consideration for said real estate, she delivered to A. J. Vestal, for the Rainwaters, a plumbing stock and business worth $5,000, and conveyed lands in Columbus, Mississippi, upon which there was a two-story brick building, worth $5,000 to J. Wood Rainwater; that soon thereafter J. Wood Rain-

water conveyed the Columbus lots and two-story building thereon to her codefendant, A. J. Vestal, and that Vestal placed a mortgage on it for $4,000 and disposed of the plumbing stock and business for $4,000.

She further alleged that as soon as she discovered that a fraud had been perpetrated on her, she offered to rescind the contract, and tendered a deed back to the Arkansas lands with her bill.

She prayed for a rescission of the entire contract, and that A. J. Vestal and the Rainwaters be required to deed her Mississippi property back and to return her plumbing stock and business, and failing to do so, that she have a judgment against them for the value of said property.

The Rainwaters filed a reply and answer to the cross-complaint of Catherine M. Cady, denying every material allegation in her answer and cross-bill, and by way of further defense thereto, alleged that she inspected the orchard before purchasing, and that by her act and conduct after the purchase, had ratified the sale.

A. J. Vestal answered, admitting liability as indorser of the notes evidencing said indebtedness for said lands and personal property, but alleged that Catherine M. Cady and T. J. Cady were the principals and primarily liable on said notes, and asked for judgment over against them for any balance that might be due after the proceeds of the land and personal property were applied to the payment of the indebtedness. He also denied the material allegations of the cross-bill of his codefendant, Catherine M. Cady, and alleged that she had bought the farm on inspection and that she had, by her conduct and acts, confirmed the sale.

The cause was heard by the court on the pleadings, depositions and exhibits, from which the court found that A. J. Vestal was the agent of the Rainwaters in making the sale and exchange; that Catherine M. Cady was induced by false and fraudulent representations to purchase the Arkansas orchard for $20,000; to execute in

payment therefor the notes in question, and to transfer the plumbing stock and Columbus lot and brick house to them.

The court decreed a rescission of the entire contract, canceled the notes, required A. J. Vestal to reconvey the lots and house to Catherine M. Cady, and gave judgment against A. J. Vestal for $4,000, the amount for which he sold the plumbing stock and business, and for $4,000, the amount of the lien placed by him on the lot and brick house in Columbus; and that J. Wood Rainwater, Pearl Rainwater and Cloud Rainwater recover of Catherine M. Cady $431.42.

The Rainwaters and Vestal excepted to the findings and decree of the court and prayed an appeal, and Catherine M. Cady excepted and prayed an appeal because the court refused to give her a personal judgment against the Rainwaters for the value of her plumbing stock and the amount of lien placed upon the Columbus real estate by A. J. Vestal.

All parties in interest having appealed, the cause is here for trial *de novo.*

The record is very voluminous and it is impractical to set out the evidence of each witness in condensed form in this opinion.

The substance of the material parts of the evidence is as follows:

Vestal & Haygood, real estate agents, residing at Arkadelphia, having obtained information concerning the Arkansas orchard from Mrs. Pearl Rainwater, went to see the orchard with J. Wood Rainwater, and after inspection and discussion with him, obtained permission to sell the farm for $15,000 net to the Rainwaters. Vestal & Haygood, thereupon, inserted the following advertisement in the Manufacturers Record, published in Baltimore, Maryland:

"APPLE ORCHARD. 440 acres. Apple farm; 20,000 bearing trees; yearly profits $15,000; located in

Arkansas Apple Belt; $80 per acre for short time. Vestal
& Haygood, Arkadelphia, Ark.''

In response to the advertisement, they received a let-
ter of inquiry from T. J. Cady, a young man twenty-three
years of age, living at Columbus, Miss., who had con-
ducted his mother's plumbing business for four years.
Neither Mrs. Catherine M. Cady nor her son, T. J. Cady,
were experienced horticulturists or orchardists.

Beginning on February 1, 1912, and continuing until
September 10, of the same year, A. J. Vestal wrote T. J.
Cady six letters. The letters were to the purport that the
orchard contained fifteen or sixteen thousand eleven-year-
old bearing apple trees, and four thousand young apple
trees just beginning to bear; that in 1910, it had netted
the owner $15,000; that it would pay a dividend on
$50,000; that the trees covered 240 acres of the 320-acre
tract; that the chief variety was Arkansas Blacks; that
the land upon which the orchard stood was worth $200 per
acre, and that the balance was good orchard land worth
$125 per acre; that single trees had borne twenty-eight
bushels, which had sold for $1.25 per bushel; that a Gov-
ernment expert had passed upon the orchard and pro-
nounced it the finest apple orchard in Arkansas; that they
were only getting a five per cent commission for making
the deal; that the orchard had always been cared for until
recently by an experienced California orchardist; that the
only reason he had gotten the owner to sell the place at
such a great sacrifice was because a brother who had lived
on the farm and cared for the orchard had died, and that
the present owners had other interests so pressing that
they could not look after the orchard; that unless the
owner sold before the crop matured, he would raise his
price to $30,000; that the owner was then using every ex-
cuse to withdraw the place from the market, but he still
had such command of the situation that he could push the
deal over the owner.

During the month of June, Haygood spent a day in
Columbus getting a line on the plumbing business and the

two-story brick building, and after his return wrote three letters suggesting that he could dispose of the plumbing business in such a manner as to apply it as a payment on the orchard; that Mrs. Pearl Rainwater had gone to school in Columbus, Mississippi, and would not be averse to acquiring property there, so it could be arranged to apply the two-story brick building as part payment for the orchard.

Having almost persuaded the young man to inspect and buy the orchard, Vestal sent six telegrams in August and September, urging haste. At last, the young man yielded to the pressing invitation and arrived in Morrilton on September 10, 1912. He was met by Vestal, and between Cloud Rainwater, J. Wood Rainwater and Vestal, the young man was entertained the two nights and parts of three days he spent in Morrilton. Plans were made to take him the next day after his arrival to the farm. Mr. Vestal and other employees of J. Wood Rainwater started for the farm early next morning with a well provisioned lunch basket and kodak. They breakfasted and lunched at beautiful, picturesque spots on Petit Jean mountain. A short time was spent in the orchard. They returned to Morrilton and the young man departed for Mississippi the following evening. During the visit on this occasion, Cady showed J. Wood Rainwater a clipping showing that twenty thousand trees were in the orchard.

The fact is that there were less than five thousand trees in the orchard; weeds had grown profusely in the orchard, but the young man had been prepared by Vestal who explained to him that the first frost would lay the weeds flat, and after the weeds were frosted down and the limbs were bended low with big, red apples, the real beauty and value of the orchard would be apparent. The owners had agreed to take $10,000 cash for the lands and to give Vestal & Haygood all over $10,000 cash received therefor, instead of paying five per cent on a $20,000 consideration. It would not pay a dividend on $50,000. It

was not a bargain at $20,000. It is doubtful whether it could have been sold for $10,000. There is quite a little proof tending to show that the value of the farm ranged from $3,500 to $6,000.

T. J. Cady returned to his home, and on September 20, Vestal renewed the negotiations by writing him a long, pressing, seductive letter. He addressed Cady as "Dear Friend Tom." He suggested to Tom that he had not only left his impress on him as a young man worthy to be counted in his list of real friends, but that he had "made a hit in Morrilton." The following excerpt from his letter illustrates the idea: "Those people will do anything for you they can, and they are in a position to do a great deal. Mr. Rainwater told me that if you bought this orchard he would help you and see that you wanted for nothing and that you made a sack of money out of the orchard. He will do it, for he is a fellow who goes his full length for those he likes." This statement was followed by a mathematical demonstration that the eighteen thousand bearing apple trees in the orchard would yield twenty thousand bushels of apples that year, and with an offer on his part to look after and market the crop.

The latter part of September, Vestal started to Mississippi, and, after spending about three weeks in Columbus, the major part of the time as a guest in Mrs. Cady's home, talking about the orchard, the trade was consummated and reduced to writing. It recites the fact that Vestal was Rainwater's agent and that there were approximately twenty thousand trees in the orchard. It provides that Mrs. Cady should give $20,000 for the orchard, payable as follows: Lot and brick house in Columbus, $5,000; plumbing stock and business, $5,000, and five promissory notes in the sum of $2,000 each, bearing interest at the rate of six per cent. per annum, the first note being due one year after date and one each year thereafter. The notes contained a provision that

upon failure to pay any note or the interest, all should become due at the option of the holder. It provided that a lien should be retained on the Arkansas farm to secure the payment of $10,000 evidenced by the notes. Mrs. Cady relied upon the representations made by Vestal and they moved her to sign the contract.

Deeds and conveyances were executed in keeping with the contract. As a result of a private agreement between the Rainwaters and Vestal, the Rainwaters accepted the notes for the farm and personal property, and Vestal accepted the plumbing business and stock, the lot and two-story brick building for his commission and his endorsement on the notes. Vestal afterwards placed a mortgage of $4,000 on the lot and brick house and sold the plumbing stock and business for $4,000.

On October 23, a short time after returning to Arkansas, Vestal wrote Cady that while in Mississippi a great many apples had ripened and wasted but that Rainwater had put a good man on the place and had ample help to take care of the crop, and suggested that Cady stay in Columbus and help with the plumbing business and that they would attend to the crop.

On November 12, Vestal wrote letters concerning his sale of the plumbing business to Whitten and gave directions to Cady concerning the settlement and adjustment of the business and preparation for the reception of Whitten when he should reach Columbus.

On December 14, Vestal wrote to Cady to keep in close touch with Rainwater; that Rainwater would be a dandy good friend to him. On December 16, Vestal wrote that Rainwater had informed him that he had about two hundred barrels of good apples and the vinegar vat full; that Whitten would go to Columbus right away and for Cady to help him. He also suggested that it was important for Cady to be at Morrilton.

While Vestal was in Columbus trying to close the deal, J. Wood Rainwater wrote Cady thanking him for the pictures; stating they had plenty of rain; that he was

as busy as "a one-eyed nigger at a three-ringed circus;" that they enjoyed his short visit and suggested that he marry Vestal off if he visited him.

On October 31, Rainwater wrote Cady he had not yet settled with Vestal, but that made no difference, as the place belonged to Cady; suggested that he come over as soon as he could get away and stay a week or so, and that it would be unnecessary for him to come back again until spring.

On December 12, Rainwater again wrote, telling Cady it would do to come after Christmas and not to hire a strange fellow; that he didn't need an orchardist (that only superbosses). Rainwater offered him his horses to ride and asked him to make his home with him; told him if he had spent all his money for Christmas presents to draw on him for $50 of his own money and come right after Christmas; advised him not to bring his mother until spring; also not to hire Hooper, who had worked for him three years.

Cady came to Morrilton and spent about two weeks at the home of J. Wood Rainwater. He learned at that time the crop had netted him eighty-five or ninety dollars, and received the explanation that the apples had gotten ripe and fallen off before they could be gathered. During this time, he visited the farm two or three days · in January and February, 1913, planning with Rhoades with reference to the culture of the orchard. It was very cold, and he remained most of the time in the house. He had relied on Vestal's representations as to the number of trees, and it did not occur to him to count them. He left Morrilton in February and did not return until June, in keeping with the suggestion of Mr. Rainwater. Rainwater wrote him three or four friendly letters during his absence. On his return he boarded at the hotel and spent about one-half of his time on the farm helping Rhoades, his employee. In October, in discussing the trade with Rhoades, he was advised for the first time to count the

trees. He began to count and continued it at odd times until completed. Immediately upon the discovery that he and his mother had been imposed upon, he reported the fact to Rainwater and demanded a rescission of the contract. Rainwater claimed he had not misrepresented the number of trees on the farm and referred him to Vestal. He communicated with Vestal but failed to get any satisfaction. He went to Arkadelphia to see Vestal and arrange for him to come to Morrilton to meet Rainwater in an attempt to adjust the matter. He could not get them together. Cady then commenced the suit; and after consulting lawyers, he gathered the crop of 1913. He then employed J. S. Wright to take charge of the farm and returned to Mississippi.

The familiar rule that fraud is never presumed but must be shown by clear proof is insisted upon for reversal. The proof is overwhelming that Vestal made false and fraudulent representations concerning the number of fruit trees on the Arkansas land; the income to be derived therefrom, the net profits to the owners in 1910, and in many other particulars.

(1)   It is insisted that the decree should be reversed because Catherine M. Cady has failed in proof to meet the four requirements for rescission on grounds of misrepresentation and fraud laid down by this court in *Matlock* v. *Reppy,* 47 Ark. 148, and approved in *Carwell* v. *Dennis,* 101 Ark. 603, and stated in the case of *Ryan* v. *Batchelor.* 95 Ark. 375. These requirements are as follows:

*First.* That there was fraud which was in the inducement of the contract.

*Second.* That it wrought an injury.

*Third.* That the relative positions of the parties were such that the vendee must necessarily have been presumed to have contracted upon the faith of the statements of the vendor.

*Fourth.* That he did rely upon them (the misrepresentations) and had a right to rely upon them in the full

belief of their truth, exercising ordinary care and diligence on his part.

It is insisted that the number of trees did not induce T. J. Cady to make the contract; that the net past average income of the orchard was all that appealed to him; that he knew nothing of the average yield per tree, the average expenses per tree or the average price per bushel. These arguments are not tenable in the face of the fact that Catherine M. Cady required Vestal to state in the written contract of sale that the orchard was to contain approximately twenty thousand trees. Vestal knew Cady had not counted the trees and Cady positively swore that he told Vestal he would rely upon his representation as to the number of trees. We are of opinion that both the representation as to the number of trees and the representation of the annual profits appealed to T. J. and Catherine M. Cady. If T. J. Cady was totally ignorant of the average production per tree and the average price per bushel, he was greatly enlightened by Vestal's letter of September 20, 1912, some days before the contract was signed. The following excerpt from that letter might enlighten a more dormant mind even than Cady's: "I have figured it out and there must be twelve thousand bushels of apples there, because there must be at least 18,000 trees with apples on them now, allowing 2,000 trees to be without fruit. This would be an average of but two-thirds of one bushel per tree, and you know we saw hundreds of trees with from ten to fifteen bushels to the tree and thousands of trees with from two to six and eight bushels per tree. I firmly believe there are 20,000 bushels, but put it where you know you are right and think what can be gotten out of it now."

It is insisted that the misrepresentation wrought no damage. Learned counsel strenuously contend that tested by the best evidence in the record on values, the plumbing business was worth not to exceed $2,500 and the lot and brick house not to exceed $3,500, and that these two amounts added to $10,000 in notes makes a

total consideration of $16,000 Catherine M. Cady paid for the 320-acre apple orchard in Arkansas; and that by the great weight of evidence the apple orchard was worth from twenty thousand to thirty-five thousand dollars, hence no damage.

Vestal sold the plumbing business for $4,000 and mortgaged the lot and two-story brick house for $4,000, very strong circumstances indeed to corroborate the testimony of the witnesses believed by the chancellor. The rental value of the brick building is a guide in leading us to believe that the chancellor's finding on this point is in accordance with the weight of evidence. We are unable to follow learned counsel in their belief that the apple orchard was worth from twenty thousand to thirty-five thousand dollars. "The proof of the pudding is in the eating thereof." We can not believe that the Rainwaters would have made so great a sacrifice in a credit sale. We can not reconcile the $20,000 valuation with an eighty-five or ninety dollar net income in 1912. The great proportion of falling apples and vinegar stock, as compared with two hundred barrels of grade apples, point unerringly to the fact that the orchard was bearing culls instead of marketable grades. Perhaps the chancellor concluded that the orchard had reached its zenith in the bumper crop of 1907. A great injury was wrought.

It is insisted that Catherine M. Cady did not rely upon the statement of A. J. Vestal, agent of the Rainwaters, and that she has not shown by proof that their relative positions were such that she must necessarily have been presumed to have contracted upon the faith of Vestal. Catherine M. Cady was in Mississippi, a long distance from the Arkansas lands. She had never been in Arkansas. Vestal was a guest in her home pressing the deal. Her son had visited and made a casual inspection of the farm but had not counted or attempted to count the trees. Vestal knew that there were less than five thousand trees in the orchard, and in order to consummate the deal, falsely and fraudulently represented

in the written contract that the orchard contained approximately twenty thousand trees. At the time he did this, he knew that T. J. Cady had not counted the trees in the orchard. The rule in *Yeates* v. *Pryor,* 11 Ark. 58, and the later cases cited by appellant sustaining that rule, have no application to a case like the instant case, where the means of information are not alike accessible to both, and where as a matter of fact a vendee had a right to rely and did rely upon the false representations of the vendor.

But it is said that because T. J. Cady had possession of the farm and remained in possession until December, 1913, Catherine M. Cady must be treated as having affirmed the sale because of her son's negligence in not sooner discovering the fraud. It is true that the law imposes the duty of diligence on the vendee of ascertaining the truth of inducing false representations made by the vendor, in order to avail himself of the right of rescission. The question of whether such diligence was used by a vendee is to be determined by the facts and circumstances in each particular case. In the instant case, Catherine M. Cady was never on the farm either before or after the purchase. Her son, T. J. Cady, spent a few hours on the farm before the purchase, and was there five or six days during January and February, 1913; and he returned to Morrilton in June and took up bed and board at the hotel, and from that time until December he spent about one-half his time on the farm, assisting Rhoades in spraying and doing other work. Rhoades had been selected and placed upon the farm by Rainwater. Cady placed great faith and credit in both Rainwater and Vestal. Their word was law with him until it was suggested by Rhoades that he count the trees. While he had attained to the age of twenty-four, this record discloses the fact that he was putty in the hands of his older friends. Rainwater was aiding and advising him. His sleep was greatly aided by outside influences. On account of his trusting nature, he was hard to arouse, but

once aroused, he became active, and, immediately upon the discovery of the fraud, demanded and insisted upon a rescission of the contract.

It is said that the *status quo* can not be restored because the orchard has been greatly damaged by the neglect and improper culture given it by Cady. The evidence does not show injurious pruning of the trees nor injury to them by cultivation of the soil. Rainwater had selected and approved of Rhoades, directed his labors in 1912, and in a measure directed both Rhoades and T. J. Cady in the culture of the orchard during 1913. No direct injury to the trees is shown by spraying, and it is not shown that the crop of 1913 was inferior in grade to the crop of 1912. The whole record convinces us that it was a neglected orchard when traded to Mrs. Cady.

But it is said that the personal property included in the deal has not been restored to the Rainwaters. The record shows nearly all the property is now on the farm and in the hands of the receiver. A small part of the property has been sold. The property in the hands of the receiver is under mortgage to Rainwater or the bank. The record does not disclose the amount due on the mortgage. It seems that the crop of 1913 was turned over to Rainwater or the bank to be applied on the debt.

It is insisted that the Rainwaters have received nothing for the use of the orchard. It appears to us that Catherine M. Cady is the only party who can complain on this score. The rental value of the brick house was far in excess of the rental value of the farm.

It is insisted, however, that the title to the Columbus real estate was not good. Vestal knew that it was clouded when he received it. No misrepresentation as to title is claimed. Catherine M. Cady is asking for no better title than she gave.

The findings of the chancellor and the decree canceling the whole transaction are correct. The chancellor, however, was in error in the amount of judgment rendered against Vestal, and in refusing to give a judg-

ment against the Rainwaters for $8,000 received by Vestal from the sale of the plumbing stock and business and the mortgage placed upon the lot and brick house, less such amount as may be due Rainwater or the bank by Cady on the chattel mortgage indebtedness.

(2-3)    The principal is responsible for the damages growing out of the false and fradulent misrepresentations of his agent within the scope of his authority. The representations made by Vestal in the instant case as to the number of trees on the orchard, the yearly income, etc., were clearly within the scope of his authority.

The judgment is affirmed in all things except as to the amount of judgment rendered against Vestal and the refusal to give a personal judgment against the Rainwaters, and in those particulars the decree is reversed and judgment is directed to be entered here against J. Wood Rainwater, Pearl Rainwater, Cloud Rainwater and A. J. Vestal for seven thousand five hundred and fifty-eight ($7,558) dollars with interest at the rate of six per cent. per annum from the 15th day of June, 1916, until paid.